UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

TIFFANY T.[1],                          )
                                        )
                        Plaintiff,      )
                                        )
            v.                          )        No. 2:19-cv-00479-DLP-JRS
                                        )
ANDREW M. SAUL,                         )
                                        )
                        Defendant.      )

## ORDER

Plaintiff Tiffany T. requests judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of her application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 423(d). For the reasons set forth below, this Court hereby **REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this matter for further consideration.

## I.    PROCEDURAL HISTORY

On May 25, 2016, Tiffany filed her application for Title II DIB benefits. (Dkt. 11-5 at 2, R. 182). Tiffany alleged disability resulting from two traumatic brain injuries, bipolar disorder, personality disorder, attention deficit hyperactivity disorder, depression, anxiety, headaches, Marfan syndrome, and chest pains. (Dkt.

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Report and Recommendation.

11-6 at 16, R. 211). The Social Security Administration ("SSA") denied Tiffany's claim initially on July 7, 2016, (Dkt. 11-4 at 2, R. 107), and on reconsideration on October 3, 2016. (Id. at 10, R. 115). On November 10, 2016, Tiffany filed a written request for a hearing, which was granted. (Id. at 19, R. 124).

On June 1, 2018, Administrative Law Judge ("ALJ") Matthias D. Onderak conducted a hearing, where Tiffany appeared in person and vocational expert Christopher Rymond[2] appeared telephonically. (Dkt. 11-2 at 44, R. 43; Dkt. 11-6 at 55, R. 250). On August 31, 2018, ALJ Onderak issued an unfavorable decision finding that Tiffany was not disabled. (Dkt. 11-2 at 17-30, R. 16-29). On October 31, 2018, Tiffany appealed the ALJ's decision. (Dkt. 11-4 at 73-75, R. 178-80). On August 7, 2019, the Appeals Council denied Tiffany's request for review, making the ALJ's decision final. (Dkt. 11-2 at 2, R. 1). Tiffany now seeks judicial review of the ALJ's decision denying benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.   STANDARD OF REVIEW

To qualify for Title II DIB, a claimant must be disabled within the meaning of the Social Security Act. To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that she is not able to perform the work she previously

---

[2] Per Mr. Rymond's résumé, the correct spelling of his last name is "Rymond." His last name is mistranscribed in the hearing transcript.

2

engaged in and, based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520(a). The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1520. (A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled.).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v.*

3

*Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id*. at 1001. The ALJ uses the RFC at step four to determine whether the claimant can perform her own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id*. The Commissioner must then establish that the claimant – in light of her age, education, job experience, and residual functional capacity to work – is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is based on substantial evidence. Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v.*

*Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Tiffany is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and

conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

### III.    BACKGROUND

**A. Tiffany's Mental Health Medical History[3]**

On July 9, 2008, Tiffany visited Dr. Robert C. Kissel of Vocational Rehabilitation Services for a psychological evaluation.[4] (Dkt. 11-7 at 3, R. 256). During the evaluation, Tiffany reported concentration difficulties; denied feelings of depression; and indicated experiencing short-term memory issues. (Id. at 8-9, R. 261-62). Dr. Kissel's clinical observations revealed that Tiffany had average alertness and responsiveness; average to flat mood; average to excess affect; reasonable attention skills; a flat, aloof, and quick interpersonal style; reasonable social skills; average problem-solving skills; and was cooperative. (Id. at 5, R. 258). Dr. Kissel's intelligence and school skill findings resulted in an average intelligence range with strengths in attention to important visual detail and weaknesses in math and vocabulary. (Id. at 6, R. 259). Dr. Kissel noted that information gathered during the examination did not support an organic brain function diagnosis. (Id. at 8, R. 261). Dr. Kissel's summary included average range intelligence with a stronger

---

[3] The Court has reviewed the medical records dating back to April 1, 2005, some of which were generated during medical visits unrelated to Tiffany's present claims. For purposes of this opinion, the Court will focus on the mental health medical records relevant to Plaintiff's present challenges.
[4] On March 3, 2008, Tiffany was struck in the head with a steel pole at work. (Dkt. 11-7 at 37, R. 290). Following the incident, Tiffany began seeing Dr. Kristin A. Mahan at Samaritan Hospital in Vincennes, Indiana through worker's compensation to address headaches, neck pain, and nausea she began experiencing after her injury. (Dkt. 11-7 at 37-38, R. 290-91). Tiffany also visited Dr. Ross D. Whitacre with Tri-State Orthopaedics in Evansville, Indiana on at least four occasions to determine whether she could return to work. (Dkt. 11-7 at 88-95, R. 341-48; Dkt. 11-8 at 12, R. 359). Tiffany was referred to Vocational Rehabilitation Services after seeking training and financial support. (Dkt. 11-7 at 3, 5, R. 256, 258).

performance on the non-verbal side; average reading, low average spelling, borderline math indicating a specific learning disability; low average to average range response to classroom and practical training approaches; above average abstracting and low average vocabulary; average memory skills when fully engaged in the task at hand; average brain function results; and that the results indicated ADHD, adjustment disorder with mixed anxiety and depressed mood, phase of life problem, and a history of post-traumatic stress disorder ("PTSD"). (Id. at 11-12, R. 264-65).

On September 9, 2008, Tiffany presented to the Samaritan Center in Vincennes, Indiana for a comprehensive assessment.[5] (Dkt. 11-14 at 46, R. 616). Tiffany complained of anxiety, anger problems, and occupational problems. (Id). Her irritability, she reported, had worsened since she was injured on the job in April 2006. (Id). Tiffany's mental status examination revealed a restricted affect; euthymic mood; cooperative behavior; appropriate thought content; normal speech; no obvious memory deficits; good attention and concentration; fair judgment and insight; and no suicidal thoughts. (Id. at 48, R. 618). Psychiatrist Dr. Michael Cantwell's diagnostic impressions included adjustment disorder with mixed anxiety and depressed mood. (Id. at 49, R. 619). Tiffany's outpatient treatment plan included individual therapy. (Id)

On September 23, 2008, Tiffany attended an individual therapy session with Dr. Briana Grimaldi at the Samaritan Center to address her psychiatric disorder

---

[5] Plaintiff provided voluminous medical records relating to her mental health treatment at the Samaritan Center between September 9, 2008 and February 6, 2018.

symptoms. (Dkt. 11-18 at 68, R. 1063). During the session, Tiffany reported issues with anger management and frustration with interpersonal relationships. (Id). Her mental status examination revealed a slightly angry mood and restricted affect with coherent thought process. (Id). Dr. Grimaldi scheduled a follow-up appointment with licensed clinical social worker ("LCSW") Kristi Harper. (Id).

On November 4, 2008, Tiffany visited the Samaritan Center for an individual therapy session to address mood regulation. (Dkt. 11-18 at 58, R. 1053). During the session, Tiffany exhibited a depressed, irritable affect and logical, coherent, and sequential thought process. (Id). LCSW Harper noted that during the session, Tiffany endorsed additional concerns about "having a conversation with herself inside [her] head" that has occurred for about two years. (Id). Tiffany's AXIS I diagnoses included mood disorder and cannabis dependence, unspecified. (Dkt. 11-19 at 54, R. 1144). Ms. Harper's plan for Tiffany included continued frequency of services and a referral to intervention and addiction services based on Tiffany's concern with ceasing marijuana use. (Dkt. 11-18 at 58, R. 1053).

On November 20, 2008, Tiffany presented to the Samaritan Center for a comprehensive assessment, where she explained that she had been sexually assaulted by a co-worker and was experiencing increased irritability, inability to sleep, and nausea. (Dkt. 11-14 at 40, R. 610). Her mental status examination revealed an angry and hostile affect; depressed mood; cooperative behavior; appropriate thought content; logical, coherent, and sequential thought process; normal speech; good attention and concentration; fair judgment; and fair insight.

(Id. at 42, R. 612). Dr. Cantwell developed an initial outpatient treatment plan to include individual therapy with LCSW Harper up to four times per week to decrease trauma response symptoms and improve mood regulation. (Id. at 43, R. 613). Dr. Cantwell's plan also included a medication clinic with a psychiatrist to reduce and eliminate Tiffany's psychiatric symptoms. (Id). The following day, on November 21, 2008, LCSW Harper reviewed Tiffany's case with the staffing psychiatrist, including her treatment recommendations, diagnoses, and pertinent history. (Dkt. 11-14 at 39, R. 609). Acute stress disorder was added to Tiffany's mental health diagnoses. (Id.; Dkt. 11-19 at 51, R. 1141).

On November 28, 2008, Tiffany visited Dr. Cantwell for an initial medication review. (Dkt. 11-16 at 20, R. 795). Dr. Cantwell noted that Tiffany reported feeling angry and focused on her anger triggers. (Id). Dr. Cantwell prescribed Zoloft to treat Tiffany's complaints of anger and Remeron to address Tiffany's sleep issues. (Id).

On December 8, 2008, Tiffany called the Samaritan Center to explain that since starting Zoloft, her panic attacks had worsened. (Dkt. 11-16 at 19, R. 794). Dr. Cantwell advised her to discontinue Zoloft and prescribed Symbyax. (Dkt. 11-16 at 18, R. 793).

On December 18, 2008, Tiffany visited the Samaritan Center for an individual therapy session. (Dkt. 11-18 at 42, R. 1037). During the session, Tiffany reported symptom improvement with her new medication and no side effects aside from problems adjusting to slowed thoughts. (Id). LCSW Harper noted that Tiffany's mood and affect were appropriate and broad; thought process logical,

coherent, and sequential; and that she was taking her medications as prescribed. (Id).

On January 16, 2009, Tiffany visited the Samaritan Center for a medication review and therapy. (Dkt. 11-16 at 16, R. 791). During the visit, she reported improvement with Symbyax with no side effects except increased appetite. (Id). Four days later, on January 20, 2009, Tiffany reported improvement in her mood regulation and feeling as though the medication was working during an individual therapy session with LCSW Harper. (Dkt. 11-18 at 34, R. 1029).

On March 16, 2009, Tiffany called the Samaritan Center and explained that she had discontinued her medication on her own. (Dkt. 11-16 at 15, R. 790). Later that month, on March 27, 2009, she visited Dr. Cantwell for a medication review. (Id. at 14, R. 789). Dr. Cantwell noted that Tiffany discontinued Symbyax due to weight gain and sedation despite receiving a clear benefit from the medication. (Id). Dr. Cantwell prescribed Prozac to replace Symbyax. (Id).

On April 3, 2009, Tiffany began having a hive-like reaction to Prozac and discontinued the medication. (*See* Dkt. 11-16 at 12-13, R. 787-88). On May 6, 2009, Tiffany visited the Samaritan Center for a medication review. (Id. at 11, R. 786). Dr. Cantwell prescribed Celexa to replace Tiffany's Prozac prescription. (Id).

On May 12, 2009, Tiffany visited the Samaritan Center for an individual therapy session. (Dkt. 11-18 at 20, R. 1015). During the session, she reported that she continued to experience difficulties related to anger. (Id). LCSW Harper noted that Tiffany agreed to practice calming activities in between sessions. (Id). Tiffany's

mental status examination revealed appropriate and broad mood and affect; logical, coherent, and sequential thought process; and that Tiffany had not yet started her new medication. (Id).

On June 15, 2009, Tiffany called the Samaritan Center to report that she was experiencing panic attacks. (Dkt. 11-16 at 9, R. 784). Dr. Cantwell noted that Tiffany had probably developed a tolerance for Celexa, so he increased her dosage and added Clonidine to address anxiety. (Id). Tiffany's treatment plan included AXIS I diagnoses of mood disorder and cannabis dependence, unspecified. (Dkt. 11-19 at 43, R. 1133).

On August 17, 2009, Tiffany visited the Samaritan Center for an individual therapy session. (Dkt. 11-18 at 10, R. 1005). Tiffany reported that she had been out of medication for about two weeks and was experiencing increasingly frequent and intensifying auditory hallucinations. (Id). LCSW Harper addressed Tiffany's medication compliance. (Id). Tiffany's mental status examination revealed an angry and irritable mood and affect, and logical, coherent, and sequential thought process. (Id).

On August 25, 2009, Tiffany presented to the LaSalle Behavioral Health Inpatient Unit at the Samaritan Center complaining of hearing voices and thoughts of harming others. (Dkt. 11-14 at 19, R. 589). Dr. Andrew Johnson noted that Tiffany was using marijuana to decrease the intensity of the voices; her mood lability had increased since discontinuing medications on her own; and that she was unable to concentrate. (Id). Tiffany's mental status examination revealed an angry

11

and hostile affect; depressed mood; moderately cooperative behavior; appropriate thought content; logical thought process; good attention and concentration; and poor judgment. (Id. at 20, R. 590). Dr. Johnson noted that Tiffany was decompensating over the last several weeks and advised that she agree to voluntary hospitalization. (Dkt. 11-14 at 37, R. 607). Tiffany was admitted for inpatient treatment based on her suicidal thoughts, aggressiveness, and psychotic symptoms. (Dkt. 11-14 at 67, R. 637). She was discharged on August 27, 2009 with prescriptions for Celexa, Cogentin, Haldol, Klonopin, and Trazodone Hydrochloride. (Dkt. 11-14 at 67, R. 637). Her discharge diagnosis was bipolar I disorder, most recent episode mixed, severe with mood congruent psychotic features. (Id).

On September 2, 2009, Tiffany visited the Samaritan Center for a follow-up individual therapy session after her release from the inpatient unit. (Dkt. 11-18 at 8, R. 1003). During the session, Tiffany complained of sedation from her medication, but stated that the medication was "making [the] voices stop." (Id). LCSW Harper noted that Tiffany exhibited a restricted and slightly withdrawn affect and mood; logical, coherent, and slowed thought process; and reported taking a decreased dose of her medications. (Id).

On October 21, 2009, Tiffany visited the Samaritan Center for an individual therapy session. (Dkt. 11-17 at 93, R. 993). During the session, Tiffany reported continued problems related to auditory hallucinations and that the "voices have become louder." (Id). Further, Tiffany reported that her inability to concentrate caused her to drop out of classes and that she was considering hospitalization if her

symptoms did not subside. (Id). LCSW Harper noted that Tiffany exhibited a restricted affect; pleasant mood; logical, coherent, and slowed thought process; and reported taking all of her medications as prescribed. (Id).

On November 9, 2009, Tiffany presented to the LaSalle Behavioral Health Inpatient Unit at the Samaritan Center requesting hospitalization. (Dkt. 11-14 at 15, R. 585). She explained that she was experiencing auditory hallucinations that were "getting louder and more demanding." (Id). Tiffany's mental status examination revealed a restricted affect; depressed mood; cooperative behavior; auditory hallucinations; normal speech; fair attention and concentration; poor judgment; and that she did not feel she could keep herself safe. (Id. at 15-16, R. 585-86). Dr. Cantwell noted a "clinical concern" that Tiffany's presentation did not match her symptoms. (Dkt. 11-14 at 33, R. 603). Dr. Cantwell noted that Tiffany endorsed problems related to hallucinations but did not respond to internal stimuli. (Id). Dr. Cantwell noted that further assessment was needed to determine if her symptoms "may be better represented by unresolved trauma issues or AXIS II features." (Id). Dr. Cantwell's diagnostic impressions included bipolar disorder, most recent episode mixed, severe with mood congruent psychotic features, and cannabis dependence, unspecified. (Id). Tiffany was admitted for inpatient treatment based on her psychotic symptoms and discharged on November 11, 2009 with prescriptions for Celexa, Cogentin, Depakote, Haldol, Klonopin, Naproxen, and Remeron. (Dkt. 11-14 at 65, R. 635). Tiffany's discharge diagnosis was bipolar I disorder, most recent episode mixed, severe with mood-congruent psychotic features

13

evidenced by depressed mood, less ability to think or concentrate, hallucinations, irritable mood, and distractibility. (Id; Dkt. 11-14 at 30, R. 600).

On November 13, 2009, Tiffany visited the Samaritan Center for a medication review to address her mood disorder. (Dkt. 11-15 at 100, R. 766). Tiffany reported needing something to help with her anxiety "so I won't smoke pot." (Id). Dr. Cantwell noted that Tiffany "sound[s] more like an addict and less like someone with a psychotic disorder or mood disorder." (Id). Dr. Cantwell adjusted Tiffany's Depakote prescription and discontinued Klonopin. (Id).

On November 23, 2009, Tiffany underwent psychological personality testing at the Samaritan Center to clarify her mental health diagnosis. (Dkt. 11-18 at 77, R. 1072). During the examination, Tiffany explained that she has had difficulty finding an appropriate medication for her condition. (Id). Dr. Joanna S. Ho's behavioral observations noted a logical thought process; stable mood; appropriate affect; intact recent and remote memory; and no evidence of auditory or visual hallucinations or delusions. (Id. at 78, R. 1073). Tiffany's test results, reviewed by Dr. D. John Vanderbeck, a psychologist, revealed unremarkable results with normal cognitive functioning on the Folstein Mini-Mental Status cognitive impairment examination. (Id). Tiffany produced an invalid and uninterpretable profile on the Minnesota Multiphasic Inventory-2 examination ("MMPI-2").[6] (Id). Tiffany's MMPI-2 results

---

[6] The Minnesota Multiphasic Personality Inventory-2 (MMPI-2) has assisted clinicians in the diagnosis of mental disorders and the selection of appropriate treatment methods. *Minnesota Multiphasic Personality Inventory-2 (MMPI-2),* https://www.pearsonassessments.com/store/usassessments/en/Store/Professional-Assessments/Personality-%26-Biopsychosocial/Minnesota-Multiphasic-Personality-Inventory-2/p/100000461.html (last visited December 30, 2020).

indicated that she was a person constantly in turmoil, and while her responses were consistent, her score suggested responses more extreme than those hospitalized for severe psychiatric issues. (Id. at 78-79, R. 1073-74). Tiffany's results on the Millon Clinical Multiaxial Inventory[7] suggested that she may be in persistent pursuit of medical care, but not respond to interventions, which may be an effort to gain sympathy and reassurance. (Id. at 79, R. 1074). Tiffany's recommendations included stabilizing psychopharmacologic medication; relieving sources of anxiety and depression and avoiding environmental pressures that aggravate or increase stress; and additional projective personality testing to clarify Tiffany's diagnosis. (Id. at 80, R. 1075).

On January 26, 2010, Tiffany visited Dr. Cantwell for a medication review to address her mood disorder. (Dkt. 11-15 at 93, R. 759). Tiffany had not been on medications "for some time" and reported being clean for two weeks aside from some panic attacks. (Id). Dr. Cantwell discontinued all Tiffany's prescriptions and prescribed Seroquel. (Id).

On March 17, 2010, Tiffany visited the Samaritan Center for a medication review to address her mood disorder. (Dkt. 11-15 at 88, R. 754). Dr. Cantwell noted that Tiffany received a clear benefit from Seroquel, but her anxiety was increasing. (Id). She was not experiencing suicidal thoughts but had engaged in self-injurious

---

[7] The Millon® Clinical Multiaxial Inventory-IV helps clinicians quickly identify clients who may require more intensive evaluation. *Millon Clinical Multiaxial Inventory-IV (MCMI-IV)*, https://www.pearsonassessments.com/store/usassessments/en/Store/Professional-Assessments/Personality-%26-Biopsychosocial/Millon-Clinical-Multiaxial-Inventory-IV/p/100001362.html (last visited December 30, 2020).

cutting to deal with tension. (Id). Dr. Cantwell increased Tiffany's Seroquel dosage. (Id).

On March 30, 2010, Tiffany visited the Samaritan Center for an individual therapy session. (Dkt. 11-17 at 63, R. 963). During the session, Tiffany reported continued improvement and no self-injury since her medication adjustment. (Id). LCSW Harper noted that Tiffany's affect and mood were appropriate and broad; thought process logical, coherent, and sequential; and that she reported taking all medications as prescribed. (Id).

On May 10, 2010, Tiffany attended an individual therapy session at the Samaritan Center. (Dkt. 11-17 at 59, R. 959). During the session Tiffany revealed that she had been cutting herself and requested a return to more frequent therapy sessions. (Id). LCSW Harper created a plan for Tiffany to resume bi-weekly therapy sessions. (Id). LCSW Harper further noted Tiffany's restricted affect; slightly depressed mood; logical, coherent, and sequential thought process; and that she reported taking all medications as prescribed. (Id).

On July 16, 2010, Tiffany visited the Samaritan Center for a medication review due to significant bipolar depression and panic-like symptoms. (Dkt. 11-15 at 85, R. 751). Dr. Cantwell prescribed Lamictal and Xanax. (Id).

On October 21, 2010, Tiffany called the Samaritan Center Crisis Contact to report self-harm by cutting. (Dkt. 11-14 at 12, R. 582). LCSW Harper noted that Tiffany was in a highly emotional state and after assessing the situation, noted that

Tiffany did not express suicidal thoughts. (Id). Tiffany agreed to a "no harm contract" and a safety plan was put in place. (Id).

On December 29, 2010, Tiffany attended an individual therapy session at the Samaritan Center. (Dkt. 11-17 at 43, R. 943). During the session, Tiffany reported that she was losing her temper "at times." (Id). LCSW Harper noted that Tiffany's affect and mood appeared restricted and unmotivated; her thought process was logical, coherent, and sequential; and that she reported taking all her medications as prescribed. (Id). Tiffany agreed to begin attending group therapy sessions as an additional treatment option. (Id). Tiffany's AXIS I diagnoses included bipolar I disorder, most recent episode mixed, severe with mood-congruent psychotic features, and cannabis dependence, unspecified. (Dkt. 11-19 at 22, R. 1112).

On January 13, 2011, Tiffany visited the Samaritan Center for an initial group therapy session.[8] (Dkt. 11-14 at 63, R. 633). Tiffany actively participated in the session and discussed struggling with anger. (Id). Her mental status examination revealed a restricted and withdrawn affect; logical, coherent, and sequential thought process; and no thoughts of harm to herself or others. (Id).

On March 25, 2011, Tiffany visited the Samaritan Center for a medication review. (Dkt. 11-15 at 80, R. 746). Tiffany reported that she had stopped taking her medications for about a month and had called the office to get restarted on Seroquel. (Id. at 80-81, R. 746-47). Dr. Cantwell increased her Seroquel

---

[8] Tiffany also attended group therapy sessions at the Samaritan Center on January 27, 2011; February 3, 2011; February 10, 2011; and March 3, 2011. (Dkt. 11-14 at 55, 57, 59, 61, R. 625, 627, 629, 631).

prescription. (Id. at 80, R. 746). Nearly two months later, on May 17, 2011, Dr. Cantwell noted during a medication review that Tiffany had experienced some weight gain, but was stable on Seroquel and Xanax. (Dkt. 11-15 at 78, R. 744).

On April 21, 2011, Tiffany attended an individual therapy session at the Samaritan Center. (Dkt. 11-17 at 40, R. 940). During the session, Tiffany reported an increase in anger, sleep, and appetite and that she had heard voices the day before. (Id). As a result, Tiffany requested to see Dr. Cantwell to adjust her medications. (Id). LCSW Harper noted that during the session, Tiffany's affect and mood were restricted and withdrawn; her thought process was logical, coherent, and sequential; and she reported taking all her medications as prescribed. (Id). During her next session, on May 21, 2011, Tiffany reported significant improvement in her mood. (Id. at 39, R. 939).

On October 17, 2011, Tiffany attended an individual therapy session at the Samaritan Center. (Dkt. 11-17 at 36, R. 936). During the session, Tiffany reported an increase in emotional distress triggered by verbal altercations, bad memories, and "mentally beating herself up." (Id). LCSW Harper noted that during the session, Tiffany's left arm was covered in superficial cuts, which Tiffany explained occurred due to anger and self-doubt. (Id). Tiffany's mental status examination revealed a depressed and withdrawn mood and affect; logical, coherent, and sequential thought process; and that Tiffany reported taking her medications as prescribed. (Id).

On December 20, 2011, Tiffany visited the Samaritan Center for a medication review. (Dkt. 11-15 at 75, R. 741). Dr. Cantwell prescribed Haloperidol. (Id). Tiffany called the Samaritan Center about three weeks later, on December 29, 2011, and reported that Haloperidol was making her restless and she could not stop moving. (Id. at 73, R. 739). Dr. Cantwell recommended she discontinue Haloperidol. (Id).

On February 17, 2012, Tiffany visited the Samaritan Center for a medication review. (Dkt. 11-15 at 66, R. 732). Dr. Cantwell noted that Tiffany reported doing well with no problems with restlessness or anger. (Id).

On March 8, 2012, Tiffany was discharged from individual therapy sessions because she achieved the goals of the program. (Dkt. 11-17 at 28, R. 928). She reported taking all her medications as prescribed. (Id. at 29, R. 929). In a treatment plan review note dated March 9, 2012, Tiffany's AXIS I diagnoses included bipolar I disorder, most recent episode mixed, severe with mood-congruent psychotic features, and cannabis dependence, unspecified. (Dkt. 11-19 at 8, R. 1098).

On November 7, 2012, Tiffany visited the Samaritan Center for a medication review to address her bi-polar disorder. (Dkt. 11-15 at 60, R. 726). During the appointment, Tiffany's mental status examination revealed an appropriate and broad affect; euthymic mood; cooperative behavior; appropriate and unremarkable thought content; logical, coherent, and sequential thought process; no obvious memory deficits; fair attention and concentration; poor judgment; fair insight; and no thoughts of suicide. (Id). Dr. Patrick Helfenbein noted that the efficacy of Tiffany's medication was fair at that time and she was experiencing nervousness.

19

Dr. Helfenbein started Tiffany on Lamotrigine for her nervousness and continued her Xanax prescription. (Id).

On December 11, 2012, Tiffany visited the Samaritan Center emergency room with complaints of increased agitation over the last two weeks and that she "can't sit still." (Dkt. 11-14 at 9, R. 579; Dkt. 11-21 at 17, R. 1267). Dr. Kristin Mahan diagnosed Tiffany with drug-induced akathisia,[9] and Dr. Cantwell agreed that her symptoms were likely a side effect of Haldol (Haloperidol). (Dkt. 11-21 at 18, 21, R. 1268, 1271). Tiffany was not admitted, but her mental status examination revealed appropriate affect; anxious mood; cooperative behavior; agitation; logical thought process; good judgment; and no suicidal thoughts. (Dkt. 11-14 at 9-10, R. 579-80). Tiffany's diagnostic impressions included bipolar disorder and cannabis dependence. (Id. at 10, R. 580). She was given Ativan and Benadryl and advised to call her doctor in the morning. (Id). The next morning, on December 12, 2012, Tiffany called the Samaritan Center to explain that she was still experiencing restlessness. (Dkt. 11-15 at 55, R. 721). Dr. Helfenbein advised Tiffany to increase her Xanax intake until her next appointment. (Id). During her next appointment on December 19, 2012, Dr. Helfenbein discontinued Haldol to stop Tiffany's akathisia and increased Lamotrigine to treat her bipolar symptoms. (Dkt. 11-15 at 53, R. 719).

On February 25, 2013, Tiffany began experiencing side effects which included the inability to concentrate and was prescribed Latuda by Board-Certified

---

[9] Akathisia is a movement disorder that makes it hard to stay still and causes an uncontrollable urge to move. Usually, akathisia is a side effect of antipsychotic drugs. *Akathisia*, https://www.webmd.com/schizophrenia/what-is-akathisia#1 (last visited December 30, 2020).

Psychiatric-Mental Health Nurse Practitioner ("PMHNP-BC"), Becca Hagemeier. (Dkt. 11-15 at 46-47, R. 712-13). On August 19, 2013, Tiffany reported that she was still taking Latuda and doing well overall. (Dkt. 11-15 at 34, R. 700).

On February 27, 2014, Tiffany visited the Samaritan Center for a medication review. (Dkt. 11-15 at 27, R. 693). During the appointment, Tiffany reported that she was not sleeping well and that she had graduated from college but was not working due to medical problems involving heart issues. (Id). Her mental status examination revealed no speech difficulties; logical and coherent thought processes; appropriate and unremarkable thought content; good judgment; appropriate mood and affect; cooperative behavior; good insight; and no reports of self-harm or harm to others. (Id. at 28, R. 694). PMHNP-BC Hagemeier noted that Tiffany's psychiatric symptoms were well controlled on medications, but she could not sleep. (Id. at 27, R. 693). Tiffany's Restoril prescription was increased. (Id. at 28, R. 694). The following day, on February 28, 2014, Tiffany reported that Restoril was helping. (Id. at 26, R. 692).

On May 22, 2014, Tiffany visited the Samaritan Center for a medication review. (Dkt. 11-15 at 19, R. 685). Tiffany expressed that she was doing well on her current medications. (Id). PMHNP-BC Hagemeier noted that Tiffany's psychiatric symptoms were well controlled on her medications. (Id). Tiffany's mental status examination revealed no speech difficulties; logical and coherent thought processes; appropriate and unremarkable thought content; good judgment; appropriate mood

21

and affect; cooperative behavior; no sleep problems; good insight; and no reports of self-harm or harm to others. (Id).

On August 21, 2014, Tiffany visited the Samaritan Canter for a medication review. (Dkt. 11-15 at 16, R. 682). Tiffany reported that she stopped taking Latuda approximately six weeks prior in an effort to lose weight for her wedding. (Id). Since then, she reported experiencing irritability, anger, depression, and inability to quiet her mind. (Id). PMHNP-BC Hagemeier stopped Tiffany's Latuda prescription and prescribed Zyprexa. (Id. at 17, R. 683).

On October 8, 2014, Tiffany visited the Samaritan Center for an individual therapy session. (Dkt. 11-17 at 26, R. 926). Tiffany reported that she stopped taking Zyprexa approximately three weeks ago "because of sedation." (Id). Tiffany explained that prior to discontinuing the medication, "voices were quieted and [her] mood was better," but without the medication her auditory hallucinations were becoming louder accompanied by paranoia and depression. (Id.) LCSW Harper noted that Tiffany agreed to return to individual therapy and medication management. (Id). Her AXIS I diagnoses included bipolar I disorder, most recent episode mixed, severe with mood-congruent psychotic features, and cannabis dependence, unspecified. (Dkt. 11-19 at 5, R. 1095).

On October 28, 2014, Tiffany visited the Samaritan Center for an individual therapy session. (Dkt. 11-17 at 23, R. 923). LCSW Harper noted that Tiffany's mood and affect appeared depressed and restricted. (Id). During her medication review, Tiffany explained that she stopped taking Zyprexa because she "was applying for a

job and did not want to have to explain why she would not pass a drug screen."
(Dkt. 11-15 at 10, R. 676). She expressed wanting to take Latuda again. (Id).
PMHNP-BC Hagemeier noted that Tiffany was stopped on Zyprexa and prescribed
Latuda. (Id. at 11, R. 677).

On November 5, 2014, Tiffany visited the Samaritan Center for individual
therapy. (Dkt. 11-17 at 21, R. 921). LCSW Harper noted that Tiffany was
experiencing increased emotional distress, urges to cut, and self-destructive
behaviors. (Id). During the session, LCSW Harper worked with Tiffany to identify
her problems using cognitive reframing techniques. (Id). Tiffany's mental status
examination revealed an irritable, tense mood and affect and a logical, coherent,
and sequential thought process. (Id. at 21, R. 921). Tiffany reported taking all
medications as prescribed. (Id).

On November 18, 2014, Tiffany visited the Samaritan Center for a
medication review. (Dkt. 11-15 at 4, R. 670). She reported that she had stopped
taking Latuda due to akathisia symptoms. (Id). PMHNP-BC Hagemeier noted that
Tiffany was prescribed Fanapt, (Id. at 5, R. 671), but stopped taking the
prescription on December 23, 2014 because it caused her heart to race. (Dkt. 11-14
at 96, R. 666). She was started on Saphris instead. (Id. at 97, R. 667).

On January 15, 2015, Tiffany visited the Samaritan Center for an individual
therapy session. (Dkt. 11-17 at 18, R. 918). During the session, Tiffany reported
improvement in her mood and identified ways to manage her symptoms free from
self-injury and substance use. (Id). LCSW Harper noted that Tiffany's mood and

affect were appropriate and broad; her thought process was logical, coherent, and sequential; and that she reported taking all medications as prescribed. (Id).

On February 27, 2015, Tiffany visited the Samaritan Center for a medication review to address her bipolar disorder. (Dkt. 11-14 at 92, R. 662). During the visit Tiffany reported doing well on her medications, but was experiencing job issues which caused anger and sadness. (Id). Based on Tiffany's complaints, her Saphris prescription was increased. (Id). PMHNP-BC Hagemeier[10] noted that Tiffany exhibited a logical and coherent thought process; appropriate and unremarkable thought content; good judgment, insight, mood, and affect; cooperative behavior; and reported no sleep problems. (Id. at 92-93, R. 662-63).

On April 29, 2015, Tiffany attended an individual therapy session at the Samaritan Center.  (Dkt. 11-17 at 13, R. 913). During the session, Tiffany reported continued mood stabilization and that she did not have urges to self-injure since her husband returned home. (Id). LCSW Harper noted that Tiffany had discontinued her medications and reported doing better without them, although she was sleeping more. (Id). LCSW Harper further noted that Tiffany's mood and affect was appropriate with a coherent and sequential thought process. (Id).

On August 14, 2015, Tiffany attended an individual therapy session at the Samaritan Center. (Dkt. 11-17 at 7, R. 907). During the session, Tiffany reported an increase in her anxiety. (Id). LCSW Harper noted that "trauma triggers indicat[ed]

---

[10] Between November 2014 and February 2015, it appears PMHNP-BC Becca Hagemeier got married or otherwise changed her name to Becca Ward. However, for consistency purposes, the Court will refer to her as PMHNP-BC Hagemeier throughout the opinion.

revision of diagnosis to PTSD" based on Tiffany's history of sexual trauma. (Id).

During the session, Tiffany's mental status included a moderately anxious and

slightly tearful affect with logical, coherent, and sequential thought process. (Id).

After the session, Ms. Harper drafted a staffing note stating that she reviewed

Tiffany's case with the psychiatrist and revised Tiffany's diagnosis to include PTSD.

(Dkt. 11-14 at 25, R. 595).

On September 10, 2015, Tiffany visited the Samaritan Center for a

medication review for bipolar disorder and PTSD. (Dkt. 11-14 at 86, R. 656). Dr.

Neil Jariwala noted that Tiffany was "feeling like she is getting more manic" and

that her mood had worsened. (Id). She had stopped taking her Saphris prescription

and was not on a mood stabilizer, but Dr. Jariwala noted that otherwise, Tiffany's

PTSD was managed. (Dkt. 11-14 at 86, 90, R. 656, 660).

On January 3, 2016, Tiffany called the Samaritan Center's Crisis Contact.

(Dkt. 11-14 at 7, R. 577). She reported that she was "losing it" and "can't stop

crying" after a verbal altercation with her husband. (Id). Dr. Cantwell noted that

Tiffany reported having cut herself; was in a highly emotional state; and had missed

two doses of her nightly medications. (Id). LCSW Harper deescalated Tiffany,

assessed her needs, and developed a behavioral management plan. (Id). Tiffany was

advised to return home to take her medications. (Id).

On April 6, 2016, Tiffany called the Samaritan Center to report that she was

having increased psychotic symptoms and hearing sounds and voices. (Dkt. 11-14 at

78, R. 648). Nurse Audrey Christian noted that Tiffany was prescribed Lithium

Carbonate to address her symptoms. (Id). Tiffany visited the Samaritan Center about a week later, on April 14, 2016, for a medication follow up. (Id. at 76, R. 646). Dr. Jariwala noted that Tiffany was experiencing psychosis. (Id). During the mental status examination, Dr. Jariwala noted that Tiffany did not have speech difficulties; had logical and coherent thought processes; good judgment; constricted mood and affect; and was positive for auditory hallucinations. (Id). Dr. Jariwala adjusted Tiffany's medications and added a prescription for Vraylar. (Id. at 77, R. 647).

On July 7, 2016, state agency psychologist Joelle J. Larsen completed a psychiatric assessment for Tiffany's DIB claim at the initial level. (Dkt. 11-3 at 6, R. 94). Dr. Larsen found that Tiffany had one or more severe medically determinable impairments, including cardiac dysrhythmias, cerebral trauma, and affective disorders between her alleged onset date, March 3, 2008, and her date last insured, March 31, 2014. (Id). Dr. Larsen found that there was insufficient evidence to determine the "B" criteria of the listings for affective disorders, that is, whether Tiffany had restrictions in her daily activities, difficulty in maintaining social functioning or maintaining concentration, persistence, or pace, and in determining whether Tiffany experienced repeated episodes of decompensation of extended duration. (Id). Dr. Larsen found insufficient medical documentation to determine the severity of Tiffany's alleged impairments and evaluate her claim. (Id. at 7, R. 95).

On September 7, 2016, Tiffany attended an individual therapy session at the Samaritan Center. (Dkt. 11-24 at 28, R. 1496). During the session, Tiffany reported

a decrease in her urge to self-injure. (Id). LCSW Harper noted that upon examination of her mental status, Tiffany's mood and affect were appropriate and restricted; her thought process logical, coherent, and sequential; and that she was taking her medications as prescribed. (Id). Tiffany's diagnoses included PTSD, insomnia due to other mental disorder; and bipolar disorder current episode mixed, severe, with psychotic features. (Dkt. 11-24 at 23, R. 1491).

On October 3, 2016, state agency psychologist Dr. B. Randal Horton completed a psychiatric assessment for Tiffany's DIB claim at the reconsideration level. (Dkt. 11-3 at 15, R. 103). Dr. Horton found that there was insufficient evidence to determine the "B" criteria of the listings for organic mental disorders or affective disorders and agreed with Dr. Larsen's finding that there was insufficient medical documentation to determine the severity of Tiffany's alleged impairments and evaluate her claim. (Id. at 15-16, R. 103-04).

Tiffany continued to visit the Samaritan Center for medication review and individual therapy sessions between October 4, 2016 and February 6, 2018. (*See* Dkt. 11-25 at 3-69, R. 1514-80; Dkt. 11-26 at 72-73, R. 1651-52). As of February 6, 2018, Tiffany was being treated for behavioral health diagnoses which included PTSD, chronic; insomnia due to other mental disorder; and bipolar disorder, current episode mixed, severe with psychotic features. (Dkt. 11-26 at 72, R. 1651).

**B. Factual Background**

Tiffany was twenty-four years old as of her March 3, 2008 alleged onset date. (Dkt. 11-6 at 25, R. 220). She has completed four or more years of college. (Dkt. 11-6

at 17, R. 212). She reported relevant past work as a fire damage cleaner, picker, factory worker, and truck driver. (Id).

### C. ALJ Decision

In determining whether Tiffany qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a) and concluded that Tiffany was not disabled. (Dkt. 11-2 at 17-30, R. 16-29). At Step One, the ALJ found that Tiffany had not engaged in substantial gainful activity since her alleged onset date of March 3, 2008. (Id. at 19, R. 18).

At Step Two, the ALJ found that Tiffany suffered from the following severe impairments: mitral valve prolapse, cannabis dependency, bipolar disorder, ADHD, and adjustment disorder. (Id). The ALJ also found that Tiffany had non-severe mental impairments of post concussive syndrome and Marfan syndrome. (Id. at 20, R. 19).

At Step Three, the ALJ found that Tiffany's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. § 404.1520(d), 404.1525, 404.1526. (Id). The ALJ determined that Tiffany's mental impairments did not meet or medically equal the severity criteria of Listings 12.04 and 12.11. (Id).

After Step Three but before Step Four, the ALJ found that Tiffany had the residual functional capacity ("RFC") to "perform a full range of work at all exertional levels," with the following non-exertional limitations:

- Cannot make judgments or decisions for more complex or detailed types of tasks, such as analyzing compiled data, directing or planning others' activities, or supervising employees;

- Must work in a stable setting where there is little change in terms of tools used, the processes employed, or the setting itself and change, where necessary, is introduced gradually;

- Should not work in an environment that is stringently production or quota-based;

- No fast-paced assembly line type of work;

- Can meet production requirements that allow her to sustain a flexible and goal-oriented pace;

- Can perform jobs that entail no more than occasional interaction with a supervisor;

- Should not perform jobs that involve working in close coordination with co-workers;

- Can work jobs that entail only occasional work-related interaction with co-workers;

- Avoid exposure to unprotected heights;

- Avoid operating motor vehicles and dangerous or hazardous machinery and equipment.

(Dkt. 11-2 at 22, R. 21).

At Step Four, the ALJ concluded that Tiffany is not able to perform any of her past relevant work. (Dkt. 11-2 at 28, R. 27).

At Step Five, relying on the vocational expert's testimony, the ALJ determined that, considering Tiffany's age, education, work experience, and residual functional capacity, she was capable of adjusting to other work. (Dkt. 11-2 at 30, R. 29). The ALJ concluded that Tiffany was not disabled. (Id.)

## IV.   ANALYSIS

Tiffany challenges the ALJ's decision on two grounds. First, Tiffany contends that the ALJ erred in interpreting her psychological treatment records and assessing her RFC without considering a psychological expert's assessment of the record and her limitations. (Dkt. 17 at 23). Second, Tiffany argues that the ALJ failed to adequately incorporate her moderate limitations in concentration, which were based on her struggles with remaining focused and being attentive, in both the RFC assessment and the hypothetical questions posed to the VE. (Id. at 26). The Court will consider these arguments in turn below.

### A. Whether the ALJ Impermissibly Interpreted Psychological Records

First, Tiffany argues that the ALJ erred in unilaterally interpreting all of the psychological treatment records and assessing the RFC without considering any agency medical expert opinion when assessing her mental limitations. (Dkt. 17 at 23). Tiffany maintains that if her medical evidence had been subjected to psychological expert review, such an expert reasonably may have opined that more severe, restrictive, and potentially disabling psychological limitations were

warranted. (Id. at 25). In response, the Commissioner asserts that the regulations do not *per se* require an ALJ to request additional opinion evidence when assessing the RFC because this is a determination for the ALJ alone. (Dkt. 23 at 8-9). Instead, an ALJ may call for a medical expert at his discretion. (Id. at 9).[11]

"The determination of a claimant's RFC is a matter for the ALJ alone – not a treating or examining doctor – to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). It is the ALJ's responsibility to review the evidence and make administrative findings of fact and conclusions of law. 20 C.F.R. § 404.1513a(b). In making those administrative findings, the ALJ will consider prior administrative medical findings and evidence from State agency medical or psychological consultants. *Id.* ALJs are not, however, required to adopt any of these findings and have the authority to assess the medical evidence and give greater weight to that which they find more credible. *Stuckey v. Sullivan,* 881 F.2d 506, 509 (7th Cir.1989); *see* 20 C.F.R. § 404.1513a(b)(1); 20 C.F.R. § 404.1527(e)(2)(ii).[12]

On July 7, 2016, state agency psychologist Joelle J. Larsen completed a psychiatric assessment for Tiffany's DIB claim at the initial level. (Dkt. 11-3 at 6, R. 94). Dr. Larsen found that Tiffany had one or more severe medically determinable impairments, but concluded there was insufficient medical documentation to

---

[11] The parties focus a lot of their attention on *McHenry v. Berryhill*, 911 F.3d 866 (7th Cir. 2018), and *Moreno v. Berryhill*, 882 F.3d 722 (7th Cir. 2018), and discuss whether the instant case is analogous to those cases. The Court, however, does not rest its decision on these cases because they are not directly on point.

[12] This rule was effective August 24, 2012 to March 26, 2017 for claims, like Tiffany's, filed prior to March 27, 2017. The current version of 20 C.F.R. § 404.1527(e) directs readers to 20 C.F.R. § 404.1513a for considerations of evidence from State agency medical or psychological consultants and notes that ALJs are not required to explain the weight given to prior administrative medical findings if the ALJ gives controlling weight to a treating sources' medical opinion.

determine the severity of Tiffany's alleged impairments and evaluate her claim. (Id. at 7, R. 95). On October 3, 2016, state agency psychologist Dr. B. Randal Horton completed a psychiatric assessment for Tiffany's DIB claim at the reconsideration level, (Id. at 15, R. 103), and similarly found insufficient evidence. (Id. at 15-16, R. 103-04). In his decision, the ALJ gave these state agency examiners' opinions little weight, finding "ample evidence" predating Tiffany's date last insured of "medically determinable and severe impairments" to determine Tiffany's functional capacity. (Dkt. 11-2 at 27, R. 26).

Tiffany appears to argue that because the State agency examiners never offered an opinion regarding her impairments, the ALJ was required to subject her psychological evidence to additional medical experts to determine Tiffany's limitations prior to formulating the RFC. (Dkt. 17 at 25-26). Tiffany claims that by failing to do so, the ALJ unilaterally interpreted complex clinical evidence and impermissibly translated such evidence into non-disabling limitations on his own. (Dkt. 17 at 24). The Court disagrees that it was necessarily incumbent upon the ALJ to seek additional medical evidence regarding Tiffany's mental limitations when the state agency consultants opined that the medical evidence was lacking.

While the ALJ has a duty to develop a full and fair record, it is the claimant – not the ALJ – who has the burden of proving she is disabled. *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017) (dismissing as frivolous claimant's argument that the ALJ should have inquired further into her testimony that she had "bad days" because it was claimant's burden, not the ALJ's, to prove she was disabled); *Nelms*

*v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (noting that claimant bears the burden of proving disability while the ALJ has a duty to develop a full and fair record). Particularly where a claimant is represented by counsel during the proceeding, as here, the Court gives deference to an ALJ's decision about how much evidence is sufficient to develop the record fully and what measures, including consultative examinations, are needed to accomplish that goal. *Poyck v. Astrue*, No. 10-2625, 2011 WL 1086858, at *2 (7th Cir. Mar. 25, 2011) (citing *Nelms*, 553 F.3d at 1098).

In this case, Tiffany has failed to identify any medical evidence that the ALJ interpreted, but instead directed the Court's attention to a vast amount of evidence that the ALJ considered when determining her RFC. Here, the ALJ provided detailed medically determined functional limitations, diagnoses, medical opinions, and treatment notes from the record that he was relying on to determine Tiffany's RFC. (Dkt. 11-2 at 20-28, R. 19-27). Unlike the facts in *Moreno*, the ALJ had the benefit of several years of detailed treatment notes from Tiffany's physicians and other medical contacts, including psychologists and social workers, and hearing testimony. *See Moreno v. Berryhill*, 882 F.3d 722 (7th Cir. 2018) (determining that ALJ's trek on his own through years of mental health records was not justified and resulted in the ALJ improperly "playing doctor;" new expert medical assessment was necessary based on new evidence that substantially changed the picture of the claimant's impairments and functioning from the time the record was reviewed by state agency experts).

First, the ALJ addressed Tiffany's July 2008 psychological evaluation performed by Dr. Robert Kissel and the spring 2008 medical assessment conducted by Dr. Whitacre. (Dkt. 11-2 at 27, R. 26). In addition, the ALJ noted the years of mental health assessments by Tiffany's counselor, LCSW Kristi Harper, which demonstrated mostly normal mental status examinations and positive results for Tiffany. (Id. at 25, R. 24 (citing Dkt. 11-14 at 59, 61, 63, R. 629, 631, 633; Dkt. 11-17 at 29-85, R. 929-85). Next, the ALJ relied on the psychological evaluation of Dr. D. John Vanderbeck, which suggested that Tiffany could be exhibiting symptom exaggeration, (Dkt. 11-2 at 25, R. 24), and the 2009 treatment notes of Dr. Michael Cantwell, which noted that Tiffany sounded more like an addict than someone with a psychotic or mood disorder. (Id). The ALJ also considered Tiffany's own personal assessment of her mental health toward the end of her treatment when she stated to her provider that she was doing well on her medications, and he also relied on the fact that Tiffany was discharged from individual therapy because she had achieved the goals of the program. (Id. at 25-26, R. 24-25 (citing Dkt. 11-17 at 28-29, R. 928-29)). He also relied on the 2013 and 2014 medical management and treatment notes from both Psychiatric-Mental Health Nurse Practitioner Hagemeier and Dr. Cantwell which continued to show normal mental status examinations even though Tiffany was continuing to skip and sometimes stop her medications. (Dkt. 11-2 at 26, R. 25 (citing Dkt. 11-15 at 19, 32, 34, 36, 42, 46, R. 685, 698, 700, 702, 708, 712)). Lastly, the ALJ weighed Tiffany's hearing testimony concerning her missing a lot of class while attending college; her struggles with depression, anxiety, mania, and

panic attacks; her inability to get out of bed at times; and her loss of jobs due to an

inability to get along with authority figures. (Id. at 22-23, R. 21-22).

Based on the evidence before the Court, the ALJ did not abuse his discretion

when he determined that it was not necessary to obtain additional medical evidence

to formulate the RFC. The ALJ's opinion reflects a thorough discussion of the vast

amount of medical records and hearing testimony the ALJ relied upon in making

his decision; he did not, as Tiffany suggests, play doctor, but instead relied on the

findings of Tiffany's treating physicians to determine her limitations. *Dixon v.*

*Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) (finding that the ALJ had not

"play[ed] doctor" where the ALJ thoroughly discussed the medical evidence in

making her decision). The ALJ had years of treatment notes, medical evidence,

evaluations, and medical opinions available in Tiffany's records to formulate an

RFC. Accordingly, the ALJ was entitled to conclude that the evidence in the record

was sufficient to render a full and fair opinion and craft an appropriate RFC for

Tiffany.

## B. Whether the ALJ's RFC Assessment is Supported by Substantial Evidence or Relevant Legal Standards

Next, Tiffany maintains that the ALJ failed to sufficiently account for her

moderate limitations in concentration in both his RFC assessment and with the

hypothetical questions posed to the VE. (Dkt. 17 at 27). Specifically, Tiffany

maintains that the ALJ failed to adequately incorporate her mental limitations –

namely, her "ability to maintain concentration without wondering off task or

requiring a break" – into the RFC and the hypothetical posed to the VE (Id. at 28-29).[13]

In response, the Commissioner asserts that the ALJ sufficiently accounted for Tiffany's mental limitations in formulating the RFC and that the Plaintiff has failed to identify any additional concentration-related restrictions that should have been included. (Dkt. 23 at 10). Specifically, the Commissioner contends that the ALJ's RFC assessment included far more limitations than those noted by the Plaintiff, and when read as a whole, sufficiently addresses her moderate ability to concentrate. (Id. at 11-12).

When crafting a claimant's RFC, an ALJ must incorporate all of a claimant's limitations in the assessment. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). Both an RFC assessment and the hypothetical posed to the VE must account for documented limitations of concentration, persistence, or pace. *Paul v. Berryhill*, 760 F. App'x 460, 465 (7th Cir. 2019) (citing *Moreno*, 882 F.3d at 730)). The determination of whether an RFC adequately captures a claimant's mental limitations is made on a case-by-case basis and is reviewed to ensure that it excludes those tasks that someone with the claimant's limitations could not perform.

Here, the ALJ found that Tiffany had a moderate limitation in concentrating, persisting, and maintaining pace. (*See* Dkt. 11-2 at 21, 28 R. 20,27). Specifically, the

---

[13] Tiffany maintains that the ALJ's RFC is not legally supported because the ALJ interpreted her psychological records independently and assessed her mental limitations without considering the opinion of a single psychological expert who reviewed any of her psychological treatment records. (Id. at 29). However, the Court rejected this argument in section IV.A *supra*.

36

ALJ noted that the "evidence supports a reasonable inference that [Tiffany] has no more than a moderate limitation in the ability to focus attention on work activities and stay on task at a sustained rate. (Dkt. 11-2 at 21, R. 20). To address her impairments, the ALJ outlined ten limitations[14] in assessing Tiffany's RFC. While, as the Commissioner argues, the ALJ's RFC contains extensive limitations, the Plaintiff maintains that none of those limitations sufficiently address Tiffany's moderate limitations in concentration. (Dkt. 17 at 27).

By limiting her to work not requiring "judgments or decisions for more complex or detailed types of tasks," Tiffany maintains that the ALJ failed to adequately address her difficulties in maintaining concentration and her need for a break. (Dkt. 17 at 28). "Though an RFC assessment need not recite the precise phrase 'concentration, persistence, or pace,' any alternative phrasing must clearly exclude those tasks that someone with the claimant's limitations could not perform." *Paul*, 760 F. App'x at 465; *see also*, *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019); *compare, Jozefyk v. Berryhill*, 923 F.3d 492, 497-98 (7th Cir. 2019) (finding that because the claimant's impairments only surfaced in social settings, the ALJ did not err in limiting claimant to "simple, routine, and repetitive tasks" that required limited-to-no social interaction).

In assessing her limitations, the ALJ determined that Tiffany cannot make judgments or decisions for more complex or detailed types of tasks, should not work in an environment that is stringently production or quota-based, and should not

---

[14] The ALJ did not number the limitations in his decision. Rather, in reviewing the ALJ's decision, the Court separated the ALJ's RFC statement into the ten limitations listed in Section III.C *supra*.

participate in fast-paced assembly line type of work. Similarly, the ALJ found that Tiffany must work in a stable setting where there is little change and change, where necessary, is introduced gradually. While these address workplace adaptations regarding persistence and pace, the Court does not find that these limitations address Tiffany's moderate mental limitations to focus on work activities and stay on task at a sustained rate without requiring a break or needing time to be off task.

Moreover, the limitations the ALJ assessed related to human interaction (i.e. no more than occasional interaction with supervisor, avoidance of jobs involving working in close coordination with co-workers, and only occasional work-related interaction with co-workers) do not address the tendency of Tiffany's attention and concentration to fluctuate. *See Anderson v. Saul*, No. 20-CV-87, 2020 WL 6867425, at *4 (E.D. Wis. Nov. 20, 2020) (finding that limitation of "no public contact, and, occasional interaction with coworkers and supervisors" addressed claimant's social functioning rather than deficiencies in concentration and persistence).

Because the ALJ's assessed RFC did not adequately address Plaintiff's limitations in the area of concentration, the Court concludes that remand is appropriate. Although the ALJ recognized Tiffany's moderate limitations in concentrating, persisting, or maintaining pace, he failed to build a logical bridge between the concentration limitations he acknowledged and the restrictions he imposed in the RFC.

Similarly, the hypothetical posed to the VE by the ALJ fails to adequately address Plaintiff's concentration limitations. (*See* Dkt. 11-2 at 22, R. 21; Dkt. 11-2 at 80-84, R. 79-83). There is no evidence here that limiting Tiffany to working in a job with little change or altering the skill requirement to eliminate the need to make judgments or decisions for complex or detailed jobs would accommodate her particular concentration limitations. Without more, the VE cannot determine whether someone with Tiffany's limitations could maintain the concentration and focus needed to sustain work performance for an extended period. On remand, the ALJ's hypothetical to the VE must include all of Tiffany's limitations, including deficiencies of concentration, for the VE to make an accurate assessment.

## V.  CONCLUSION

For the reasons detailed herein, this Court **REVERSES** the ALJ's decision denying Plaintiff benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four) as detailed above. Final judgment will issue accordingly.

So ORDERED.

Date: 12/31/2020

Hon. Doris L. Pryor
United States District Court
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the Court's ECF system.